IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MICHAEL RAY ALLEN, JR.                                          PLAINTIFF

v.                          Civil No. 5:22-CV-05199-TLB-CDC

PATROL OFFICER PERKINS                                          DEFENDANT

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This is a civil rights action filed pursuant to 42 U.S.C. § 1983. Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3), the Honorable Timoth L. Brooks, United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation. Currently before the Court is Defendant's Motion for Summary Judgment. (ECF Nos. 28, 29, 30). For reasons set forth below, the undersigned recommends that the Motion be granted.

### I. BACKGROUND

Plaintiff filed his Complaint on September 27, 2022, (ECF No. 1), and he was granted *in forma pauperis* status. (ECF No. 3). An Order directed Plaintiff to submit an Amended Complaint to address pleading deficiencies, (ECF No. 7), and it was filed on October 28, 2022. (ECF No. 9). On December 2, 2022, Defendant filed a Motion to Dismiss (ECF No. 14), and the undersigned directed Plaintiff to respond or file a newly Amended Complaint. (ECF No. 16). A Second Amended Complaint was filed on December 14, 2022 (ECF Nos. 17, 18), and the Motion to Dismiss denied as moot. (ECF No. 20).

Plaintiff is currently incarcerated in the Arkansas Division of Correction ("ADC") Cummins Unit, but his Second Amended Complaint focuses on events which led to his incarceration for a parole violation. (ECF No. 18). Plaintiff alleges that on June 30, 2022, at 10:30

1

p.m., he was walking home from the store[1] with his dog when Defendant Patrol Officer Perkins turned his vehicle spotlight on him. (*Id*. at 3). Plaintiff states Defendant Perkins had already seen him going into the store and did not approach until Plaintiff left the store. (*Id*. at 4). When Defendant turned the spotlight on him, Plaintiff alleges that, because he was breaking no law, he approached Defendant Perkins to see if he could be of assistance. (*Id*.). Plaintiff states he understood that, because of the Thirteenth Amendment, he was considered a slave or property of the State of Arkansas but approached, nonetheless. (*Id*.). Plaintiff alleges he asked Defendant Perkins what was wrong, at which point Defendant tried to get him to produce his identification papers. (*Id*. at 5). Plaintiff states he had left his identification papers at home and did not believe it was necessary to carry them because he was not living in either Nazi Germany or the Soviet Block. (*Id*.). Plaintiff alleges that "at no point did Officer Perkins state I was suspected of any wrongdoing, only that he wanted me to produce papers or tell him who I was." Plaintiff further elaborates:

> While I knew I was a slave or property of the State, because of the thirteenth Amendment, and that I was obligated to being searched at any time, I also could tell that Officer Perkins did not know this and that his actions until I was positively identified was illegal. At least that was my thought. The City of Rogers may well teach their officers to randomly ask people for their papers based on race, ethnicity, or what neighborhood they are in.

(*Id*.). Plaintiff says he "held his ground" and refused to give his papers or answer questions until Defendant Perkins threatened his dog. Specifically, he alleges Defendant Perkins threatened to call Animal Control to have them take Plaintiff's dog and put it down. Plaintiff states that he then

---

[1] Plaintiff did not identify the store he exited in his Second Amended Complaint. In his original Complaint, however, he indicated he left a Casey's convenience store. (ECF No. 1 at 4). Although his original Complaint was superseded by the two later Amended Complaints, the Court takes judicial notice of the fact to provide clarity to the factual background regarding this and other businesses referenced in the summary judgment record.

2

gave his name under duress because he "cares more about his dog than any confinement or trouble." (*Id*. at 5-6). Plaintiff alleges that, once he gave his name, he was searched and charged with various crimes. (*Id*. at 6). "Amazing, however, the City did not pursue those as (a). I was going to be locked up anyway and (b) I might get a public defender who knew what they were doing. (*Id*.). Plaintiff argues that, until he was identified, he "was just a citizen of the U.S. and for that reason this was a violation of my 4th and 5th Amendment" rights." (*Id*.).

Plaintiff proceeds against Defendant Perkins in his individual capacity. (*Id*. at 4). He seeks compensatory damages for pain, suffering and lost wages, as well as punitive damages. (*Id*. at 7).

Defendant Perkins filed his Motion for Summary Judgment on July 5, 2023. (ECF Nos. 28, 29, 30). He argues (1) he had reasonable suspicion to detain and question Plaintiff based on the totality of the circumstances; (2) he lawfully arrested and searched Plaintiff because Plaintiff had refused to provide identification and had a parolee search waiver on file; (3) Plaintiff's Fifth Amendment rights were not violated; and (4) Defendant Perkins is entitled to qualified immunity. (ECF No. 29).

In the documentation submitted in support of Defendant's Motion, the date and order of the incident events differ somewhat from Plaintiff's. In his probable cause affidavit concerning the incident, Defendant Perkins states:

> The records of the Rogers Police Department reflect that on Saturday, June 25, 2022, at approximately 2257 hours, MPO (Master Police Officer) Perkins was in the area of South 2nd Street and West Locust Street, when he observed a male walking his dog across South 2nd Street. MPO Perkins thought the subject was possibly a male identified as Maurice Floyd, who had multiple felony warrants issued for his arrest. As MPO Perkins was trying to locate a photo of Floyd, he realized that he lost sight of the subject and was unable to locate him again.
>
> A short time later, MPO Perkins was driving northbound on South 2nd Street, when he looked down West Olive Street and observed a silhouette of a person walking from the direction of a closed business toward another closed business. MPO

3

Perkins turned around to check on the subject and ensure that the person was not breaking into business as the area he was in was dark and there were no houses in the immediate area. As MPO Perkins approached the subject, he observed that it was the same male who he previously thought may have been Maurice Floyd. MPO Perkins found it odd that the subject was taking a different route and seemingly trying to avoid MPO Perkins by walking around closed businesses that had very little light around them.

MPO Perkins made contact with the male and informed him why he stopped to talk to him. The male stated he was walking home, so MPO Perkins asked where he lived. The male told MPO Perkins that he lived on C Street, which was the same street Maurice Floyd lived on. MPO Perkins asked the male a specific address and he hesitantly responded "840" as if he had to think about his answer. MPO Perkins asked the male for identification, and he did not cooperate. The male began telling MPO Perkins that he had no reason to identify him because he was doing nothing wrong. After asking the male multiple times, he finally informed MPO Perkins that his name was Mike Allen but refused to give his date of birth. MPO Perkins asked Mike for his date of birth several times and informed him that if he did not provide it, he would go to jail for obstruction. Mike still refused, so MPO Perkins placed him [in] custody for obstruction.

During a search of his person, MPO Perkins located a black spherical container that contained two plastic bags with suspected methamphetamine. The suspected methamphetamine was tested using a field test ampule and it turned blue indicating a positive result for methamphetamine. MPO Perkins continued his attempts to positively identify Mike but was not able to. Mike eventually agreed to identify himself if MPO Perkins would arrange for his dog to be taken to his house that was actually located at 820 North C Street. MPO Perkins agreed, and Mike identified himself as Michael Allen, DOB: [redacted].  After checking Allen Via ACIC, it was discovered that he had a full extradition felony warrant out of the Arkansas Board of Probation and Parole. Michael was later transported to the Benton County Jail to be held for charges of possession of a controlled substance and obstructing governmental operations. His dog was taken to 820 North C Street and placed in the back yard. MPO Perkins later checked the business[es] to ensure they had not been tampered with and did not locate any damage.

MPO Perkins Mirandized Allen and after stating he understood each right. He agreed to speak without counsel. MPO Perkins asked Allen if he planned on selling the methamphetamine and he said no that it was just personal use and he got it for the weekend. MPO Perkins asked Allen how long he had been running from his warrant and he stated, "I always abscond".

MPO Perkins transported the suspected methamphetamine to the Rogers Police Department and entered it into the property room as evidence. The total weight of

4

> the two bags containing suspected methamphetamine was 7.5 grams. It will be sent to the Arkansas State Crime lab for drug analysis.
>
> No Further information

(ECF No. 30-2).

In response to the Motion, Plaintiff argues he was stopped, threatened, and searched by Officer Perkins at approximately 10:30 p.m. on June 30, 2022. (ECF No. 32 at 1). He alleges this is shown on video footage provided to the Court. (*Id.*). The undersigned pauses to note it has not received video footage for this case from either party. Plaintiff argues he has stated an official capacity claim, and in the event he has not, he asks that the individual capacity claim remains. (*Id.* at 2). Finally, he states stopping citizens and asking them for their papers is reminiscent of Nazi Germany. (*Id.*).

Plaintiff submitted a document labelled "Undisputed Facts," which contains five points. The undersigned first notes this document was not filed in compliance with the Court's Order, the Local Rules or the example provided for Plaintiff in his Prisoner Litigation Guide. Specifically, Plaintiff was advised that if he "disputes any of the facts set forth by the Defendant in the Statement of Undisputed Facts, each numbered paragraph <u>must be identified</u> that contains the fact in dispute <u>and</u>, for each paragraph identified, explain <u>why</u> there is a dispute." (ECF No. 31) (emphasis in original). Plaintiff's document is not responsive to the 20 numbered paragraphs in Defendant's Statement of Facts. Instead, Plaintiff provides 5 paragraphs using alphabetical labels. Plaintiff repeats his allegations that he was stopped at approximately 10:30 p.m. on June 30, 2022. (ECF No. 32 at 3). He repeats allegations that he was detained and asked for ID which he did not have. He alleges, for the first time in this case, that Defendant Perkins said he fit the description of

5

Maurice Floyd. (*Id*.). He says he saw a picture of Floyd and it did not match his description.[2] (*Id*.). After he was handcuffed, Plaintiff asked for a supervisor several times and was denied. (*Id*.) Plaintiff alleges Defendant Perkins searched his belongings without his permission, and then arrested him for loitering, obstruction, and possession of a controlled substance. (*Id*. at 1-2). Plaintiff again refers to a flash drive of the dash camera and body camera; however, the undersigned again notes that such items were not submitted evidence in this case by either party.

Defendant Perkins filed his Reply on July 27, 2023. (ECF No. 33). He repeats that Plaintiff was stopped on June 25, 2022. (*Id*. at 1). He notes that Plaintiff never saw a photo of Maurice Floyd, but did ask to speak to a supervisor, neither of which are facts material to this case. (*Id*.). He argues Plaintiff has not pointed to any additional facts which would constitute evidence of an unconstitutional claim.

As a preliminary matter, the Court notes that Plaintiff alleges the incident in this case occurred on June 30, 2022. Defendant Perkins alleges it occurred on June 25, 2022. There is no dispute, however, that both are referring to the same incident, and that the actual date is immaterial to the analysis.

## II.  LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with

---

[2] Neither photographs nor a description of Maurice Floyd or Plaintiff were submitted into the summary judgment record by either party.

the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.  ANALYSIS

#### A.  Plaintiff's Failure to Comply with Local Rules

Local Rule 56.1(a) requires any party moving for summary judgment to submit a separate statement of undisputed material facts. Local Rule 56.1(b) requires the non-moving party opposing the summary judgment motion to file a separate statement of disputed facts. *Pro se* inmates are advised of this requirement in the Order directing them to file a summary judgment response. *Pro se* inmates are also advised of this requirement in the District's Prisoner Litigation Guide, which contains an example to help them understand the concept of using the same paragraph numbering as that used by the moving party in their own statement of disputed facts.

Because Plaintiff failed to comply with the Court's Order to Provide a Separate Statement of Disputed Facts and the Local Rules of Civil Procedure, Defendant's Statements of Facts is

deemed admitted pursuant to Local Rule 56.1(c). In determining whether there are genuine disputes of material fact for trial, however, the Court has also considered the allegations set forth in Plaintiff's verified Amended Complaint. A verified complaint is the equivalent of an affidavit for summary judgment purposes. *See, e.g., Roberson v. Hayti Police Dep't*, 241 F.3d 992, 994-95 (8th Cir. 2001). "[A] complaint signed and dated as true under penalty of perjury satisfies the requirements of a verified complaint . . . ." *Id*. As the Court in *Roberson* pointed out, "[a]lthough a party may not generally rest on his pleadings to create a fact issue sufficient to survive summary judgment, the facts alleged in a verified complaint need not be repeated in a responsive affidavit to survive the summary judgment motion. *Id*. The Court will, therefore, "piece[] together [Plaintiff's] version of the facts from the verified complaint . . . ." *McClanahan v. Young*, No. 4:13-cv-04140, 2016 WL 520983, *1 (D.S.D. Feb. 5, 2016).

### B. Plaintiff's Arkansas Parolee Search and Seizure Waiver

There is no dispute that Plaintiff is an Arkansas parolee and signed a search waiver as part of his conditions of release. This waiver states:

> **SEARCH AND SEIZURE.** You must submit your person, place of residence, motor vehicles. and/or any other area or property under your control to search and seizure at any time, day or night, with or without a search warrant by any Arkansas Community Correction officer or any other certified law enforcement officer.

(ECF No. 30-3 at 3). This waiver was signed on October 29, 2019, and was valid for a period of 6 years. (ECF No. 29 at 7). Thus, it was in effect on the night of the incident for this case. The waiver is based on Arkansas statutory law and required for all Arkansas parolees:

> **(a) (1)** A person who is placed on supervised probation or is released on parole under this chapter is required to agree to a waiver as a condition of his or her supervised probation or parole that allows any certified law enforcement officer or Division of Community Correction officer to conduct a warrantless search of his or her person, place of residence, or motor vehicle at any time, day or night, whenever requested by the certified law enforcement officer or division officer.

8

> **(2)** A warrantless search that is based on a waiver required by this section shall be conducted in a reasonable manner but does not need to be based on an articulable suspicion that the person is committing or has committed a criminal offense.
> **(b) (1)** A person who will be placed on supervised probation or parole and is required to agree to the waiver required by this section shall acknowledge and sign the waiver.

Ark. Code Ann. §§ 16-93-106(a)(1)-(2) and (b)(1).

It is well-established that waivers for the suspicionless search and seizure of parolees pursuant to a state statute do not violate the Fourth Amendment. *Samson v. California*, 547 U.S. 843, 853 (2006); *U.S. v. Thabit*, 56 F.4th 1145, 1149 (8th Cir. 2023) ("*Samson* ultimately held that a suspicionless search of a parolee pursuant to a California statute was constitutional"). Thus, once Plaintiff was identified as a parolee, his Fourth Amendment search and seizure rights could not be violated by the type of search and seizure implemented by Defendant Perkins.

There is, however, some inconsistency in the summary judgment record as to when this identification occurred. In his Amended Complaint, Plaintiff alleges he was searched and charged with crimes after he gave his name to Defendant Perkins to protect his dog. In his Summary Judgment Response, he states he was stopped, threatened, and searched, but does not indicate when Perkins received his full identification, which includes his birthdate. He also states he was detained and was asked for ID which Plaintiff did not have. In Defendant Perkin's probable cause affidavit, Perkins states he placed Plaintiff in custody for obstruction before obtaining his date of birth, which, in conjunction with his name, led to his discovery of the existence of the waiver and warrant. Thus, for the purposes of this Report and Recommendation, the Court will consider Defendant Perkin's statement as the timeline. With this timeline, Plaintiff's identity was not verified until after he was arrested for obstruction and searched. Thus, the question remains as to

9

whether Defendant Perkins violated Plaintiff's rights prior to obtaining Plaintiff's full identification information.

### C. Reasonable Suspicion for *Terry* Stop Prior to Full Identification

A police officer can stop and briefly detain a person for investigatory purposes if the officer has a reasonable suspicion that criminal activity "may be afoot." This is known as a "*Terry* stop." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). To determine whether Defendant had reasonable suspicion to conduct a *Terry* stop, the Court looks at the information Defendant possessed at the time. *Terry* 392 U.S. at 21-22 (1968). The Court views Defendant's "observations as a whole, rather than as discrete and disconnected occurrences." *Waters v. Madson*, 921 F.3d 725, 736 (8th Cir. 2019). The "determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125. If a Defendant "lacked reasonable suspicion and thus conducted an unlawful *Terry* stop, she may nonetheless be entitled to qualified immunity if she had arguable reasonable suspicion—that is, if a reasonable officer in the same position could have believed she had reasonable suspicion." *Waters*, 921 F.3d at 736.

"Reasonable suspicion is a fact-specific inquiry, determined by the totality of the circumstances, taking account of an officer's deductions and rational inferences resulting from relevant training and experience." *Irvin v. Richardson*, 20 F.4th 1199, 1204 (8th Cir. 2021) (citing *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002). "It requires 'some minimal level of objective justification,' but a series of acts may be 'innocent if viewed separately, but . . . taken together warrant [] further investigation.'" (*Id.*) (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 9-10 (1989) (cleaned up)). "Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence." *U.S. v. Quinn*, 812 F.3d 694, 697–98 (8th Cir. 2016)

10

(quoting *United States v. Dawdy,* 46 F.3d 1427, 1429 (8th Cir.1995)). "In addition, a person's temporal and geographic proximity to a crime scene, combined with a matching description of the suspect, can support a finding of reasonable suspicion. (*Id.*) (citing *United States v. Juvenile TK,* 134 F.3d 899, 903–04 (8th Cir.1998)). "[A]rgumentative, evasive, and uncooperative behavior" can support a finding of reasonable suspicion. *Waters*, 921 F.3d at 738 (8th Cir. 2019). Indeed, the combination of "unpredictability, evasiveness, argumentative demeanor, refusal to disobey legitimate officer commands" and a size difference between the suspect and the officer has been found to support handcuffing and placement of the suspect in a patrol car during a *Terry* stop to protect officer safety and maintain the status quo. (*Id.*).

In contrast, "a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Fla. v. Bostick*, 501 U.S. 429, 437 (1991). Nor is "an individual's presence in an area of expected criminal activity, standing alone, . . . enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Finally, passive observation of police-citizen interactions from a distance combined with a refusal to supply full identification is insufficient to establish reasonable suspicion. *Chestnut v. Wallace*, 947 F.3d 1085 (8th Cir. 2020).

Here, the record supports that Defendant Perkins had reasonable suspicion to suspect that crime was afoot. While on patrol at approximately 10:30 p.m., he saw Plaintiff walking his dog and believed he met the description of Maurice Floyd, who had multiple felony arrest warrants. While looking for a photo of Floyd, Perkins lost sight of Plaintiff. Perkins later saw the silhouette of an individual walking from one closed business to another closed business. Concerned that the individual might be attempting to break into the closed businesses, Perkins approached and observed it was the same individual he had seen earlier and believed to be Maurice Floyd. Because

11

this was a different route than Plaintiff appeared to be initially taking, and because Plaintiff was keeping to dimly lit areas near the closed businesses, Defendant Perkins believed Plaintiff was trying to avoid him. When approached, Plaintiff told him he was walking home, and when queried as to his address, he "hesitantly" gave him an address on the same street as Floyd. He then refused to give Perkins identification when asked, stating he had no reason to give him that information because he was not doing anything wrong. He then gave his name as Mike Allen but refused to give his date of birth. He was then placed in custody for obstruction.[3] During a search of his person, Defendant found a substance which tested positive for methamphetamine. Plaintiff then gave his full name and date of birth in exchange for a promise to have his dog taken to his house. At this point his status as a parolee and the warrant from the Arkansas Board of Probation and Parole became known.

Several factors support the existence of reasonable suspicion in this case. First, Defendant Perkins believed that Plaintiff was Maurice Floyd, an individual with multiple outstanding felony warrants. This belief was initially based upon his appearance, and further bolstered by some apparently evasive action in the presence of a police officer. Although this belief was ultimately shown to be incorrect, a reasonable but mistaken belief can justify an investigative stop. *See U.S. v. Bailey*, 417 F.3d 873, 877 (8th Cir. 2005); *U.S. v. Black-McCormick*, No. 12-00363-14-CR-W-DGK, 2014 WL 7005189, at *3 (W.D. Mo. Dec. 10, 2014) ("Inherent in the concept of reasonable

---

[3]There does not appear to be any dispute that probable cause existed to arrest Plaintiff for obstruction. Based on the summary judgment record before the Court, Defendant Perkins was investigating suspected criminal activity, and Plaintiff was, therefore, required to comply with the identification request under Arkansas law. *See Brown v. Jordan*, No. 5:18-CV-05199, 2019 WL 637720, at *6 (W.D. Ark. Feb. 14, 2019) (discussing the Arkansas obstruction statute and Rule 2.2 of the Arkansas Rules of Criminal Procedure in the context of a Section 1983 claim for unlawful arrest).

suspicion is the fact that officers may be mistaken in their beliefs."). Second, the perceived evasive behavior occurred late in the day and after dark; Plaintiff was observed approaching closed businesses in a poorly lit area. Loitering late at night near closed businesses can support a reasonable suspicion that crime may be afoot. *See U.S. v. Trogdon*, 789 F.3d 907, 910 (8th Cir. 2015). Third, once stopped, Plaintiff was uncooperative, repeatedly refusing to identify himself fully, and then hesitantly giving a home address on the same street as Maurice Floyd. Refusal to identify oneself to officers, combined with other factors, can constitute reasonable suspicion. *See Waters*, 921 F.3d at 736-37. Taking these facts together, the undersigned concludes Defendant Perkins had reasonable suspicion to suspect that crime was afoot.[4] Without facts in material dispute, Defendant Perkins is entitled summary judgment as a matter of law.

### D.  Fifth Amendment Violation

Plaintiff also alleges that his Fifth Amendment rights against self-incrimination were violated because Plaintiff only agreed to identify himself fully when Defendant Perkins threatened to have his dog euthanized, and Defendant Perkins asked him questions after reading him his *Miranda* rights. Defendant argues Plaintiff did not invoke his Fifth Amendment rights at any time during the interaction, and Plaintiff raised no dispute to this argument in his Summary Judgment Response. It is not necessary to address these arguments because the United States Supreme Court recently held that "a violation of *Miranda* does not necessarily constitute a violation of the Constitution, and therefore such a violation does not constitute "the deprivation of [a] right . . . secured by the Constitution" and cognizable under 42 U.S.C. § 1983. *Vega v. Tekoh*, 597 U.S. 134, 150 (2022). Thus, Defendant Perkins is entitled to summary judgment as a matter of law.

---

[4] As the Court finds Defendant Perkins had reasonable suspicion, it is not necessary to address whether Perkins had arguable reasonable suspicion.

13

## IV.  CONCLUSION

Accordingly, it is recommended that Defendant's Motion for Summary Judgment.  (ECF No. 28) be GRANTED and Plaintiff's claims be dismissed WITH PREJUDICE.

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this 21st **day of December 2023**.

*Christy Comstock*
CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE